UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Raphael Mendez,

    Plaintiff,

v.

FMC Minnesota, Lt. Holbus, Officer Kepp, Eberle, A. Culberbon, and any other Unknown Individuals such as the R and D Operation,

    Defendants.

Civ. No. 16-845 (ADM/BRT)

**REPORT AND RECOMMENDATION**

---

Raphael Mendez, FMC Rochester, PMB 4000, Rochester, MN, *pro se* Plaintiff.

Erin M. Secord, Esq., United States Attorney's Office, Counsel for Defendants.

---

BECKY R. THORSON, United States Magistrate Judge.

    *Pro se* Plaintiff Raphael Mendez alleges that he was improperly disciplined for failing to provide a urine sample while detained at FMC Rochester. Plaintiff asserts that the Defendants "tortured" him by placing him in the Segregated Housing Unit ("SHU") for six days, from the evening of March 17, 2016, through March 23, 2016. (Doc. No. 1, Compl. 1, 3–6.) Plaintiff claims that he was forced to sleep on a mattress on the floor, his cell was dirty and drafty, and he was denied telephone and email privileges. (*Id.* at 4.) Plaintiff also alleges that when he was released, he discovered that some of his personal property was missing, including clothing and photographs. (*Id.* at 5.) Plaintiff argues that

he should not have been disciplined and that his stay in the SHU constituted cruel and unusual punishment. (*Id.*)

Plaintiff sues Lieutenant Darek Holbus, Officer Joshua Kepp, Officer Adam Culbertson,[1] Officer Carl Eberle (collectively the "Individual Defendants"), "FMC Minnesota et al," and "the Property R and D Operation." (Compl. 1.) Defendants move to dismiss for lack of subject-matter jurisdiction, for failure to state a claim, and for summary judgment. (Doc. No. 8.) For the reasons stated below, this Court recommends that the motion be addressed as a motion for summary judgment and be granted.[2]

## I. BACKGROUND

Plaintiff is currently incarcerated at FMC Rochester in Rochester, Minnesota. (Doc. No. 14, Declaration of Steve Stolarzyk ("Stolarzyk Decl.") ¶ ¶ 7–8, Ex. B.) Plaintiff was originally indicted in the U.S. Virgin Islands in 1990 for assault, possession of an unlicensed firearm during the commission of a violent crime, and possession of a firearm by a felon. *See Mendez v. Bureau of Prisons*, No. 08-CV-4971 (JMR/RLE), 2009 WL 3856925, at *1 (D. Minn. Nov. 17, 2009). After the Court found Plaintiff incompetent to stand trial, he was sent to the Federal Medical Center in Butner, North Carolina, for a period of restoration. *Id.* Plaintiff was not restored to competency, so in

---

[1]  Plaintiff misspelled Defendant Culbertson's name "Culberbon" in the case caption.

[2]  This Court finds it unnecessary to address this motion using three different standards of review. Since Defendants introduced facts outside of the pleadings, the simpler course of action is to treat the motion as a summary-judgment motion. Plaintiff does not argue that he is unable to "present facts essential to justify [his] opposition" to the summary-judgment motion. Fed. R. Civ. P. 56(d).

2

1991, he was civilly committed under 18 U.S.C. § 4246 in the Eastern District of North Carolina. *Id.* Plaintiff is a frequent litigator in federal court. *See, e.g.*, *Mendez v. Haugen*, No. 14-cv-4792 (ADM/BRT), 2015 WL 5718967, at *6 (D. Minn. Sept. 29, 2015) (listing previous cases).

Under Program Statement 6060.08, *Urine Surveillance and Narcotic Identification*, FMC Rochester performs urine surveillance on six categories of inmates: (1) "random," i.e., a random selection of inmates, totaling 5% of the institution's total population; (2) "community activities," i.e., 50% of inmates participating in community activities; (3) "disruptive groups," i.e., every confirmed member of a disruptive group; (4) "suspected," i.e., inmates who staff suspect are using unauthorized narcotics; (5) "saturation," i.e., targeting a large group of inmates for testing; and (6) "prior acts," i.e., inmates who have been found by the Discipline Hearing Officer ("DHO") to have committed enumerated disciplinary code violations, including Refusing to Provide a Urine Sample in violation of Code 110. (Doc. No. 13, Declaration of Aaron Wieczorek ("Wieczorek Decl.") ¶ 4; Ex. A at 3–4.) The list of inmates randomly selected for urinalysis testing is generated on the first work day of each month, and the testing of each inmate on the list must be completed by the end of the month. (*Id.* ¶ 5; Ex. A at 7.) On March 1, 2016, Plaintiff was number twenty-nine out of thirty-four on this random list. (*Id.* ¶ 8; Ex. B.) There is no exception to urinalysis testing for civilly committed inmates. (*Id.* ¶ 5; Ex. A at 7.)

The procedure for an inmate to provide a urine sample is outlined in Program Statement 6060.08 as follows:

3

> Staff of the same sex as the inmate tested shall directly supervise the giving of the urine sample. If an inmate is unwilling to provide a urine sample within two hours of a request for it, staff must file an incident report. No waiting period or extra time need be allowed for an inmate who directly and specifically refuses to provide a urine sample. To eliminate the possibility of diluted or adulterated samples, staff shall keep the inmate under direct visual supervision during this two hour period, or until a complete sample is furnished. To assist the inmate in giving the sample, staff shall offer the inmate eight ounces of water at the beginning of the two hour time period. An inmate is presumed to be unwilling if the inmate fails to provide a urine sample within the allotted time period. An inmate may rebut this presumption during the disciplinary process.
>
> Ordinarily, an inmate is expected to provide a urine sample within two hours of the request, but the Captain (or Lieutenant) may extend the time if warranted by specific situations (for example, the inmate has a documented medical or psychological problem, is dehydrated, etc.).
>
> Staff may consider supervising indirectly an inmate who claims to be willing but unable to provide a urine sample under direct visual supervision. For example, this might be accomplished by allowing the inmate to provide the sample in a secure, dry room after a thorough search has been made of both the inmate and the room.

(*Id.* ¶ 6; Ex. A at 4.)

It is not unusual or uncommon for FMC Rochester inmates to be unable to provide a urine sample within the time allotted, or not be able to produce urine at all because of documented medical conditions. (*Id.* ¶ 7.) Inmates who can physically produce urine but might need additional time or other accommodations are expected to provide a urine sample within two hours, with additional time if authorized. (*Id.*) If an inmate does not produce a urine sample, he will receive an incident report, but he will be allowed to present his medical documentation during the disciplinary process in order to rebut the presumption that he refused to produce a urine sample. (*Id.*) An inmate who has a documented medical condition that makes it difficult to produce a urine sample on

4

demand will receive an incident report for refusing to provide a urine sample if he refuses to even try to produce a sample. (*Id.*)

On March 17, 2016, at approximately 4:47 p.m., Defendant Eberle notified Plaintiff that he had two hours to provide a urine sample. (Stolarzyk Decl. ¶ 10; Ex. D at 1.) Officer Eberle provided Plaintiff with water to assist him, but Plaintiff did not drink the water. (*Id.*) Plaintiff alleges that he could not comply with the order because he has low stomach acid, which causes him to retain water. (Compl. 2.) Plaintiff told staff that if he ate something with potassium, he would no longer retain water. (*Id.*) Staff then provided Plaintiff with a meal tray that included, among other items, a sweet potato,[3] which Plaintiff claims to have eaten. (*Id.* at 3.) Plaintiff was still unable to provide a urine sample, and Defendant Holbus informed Plaintiff that his failure was considered a "refusal." (*Id.*)

An unidentified staff member then ordered that Plaintiff be placed in the SHU designated for mental health inmates. (*Id.*) Defendant Kepp provided Plaintiff with one blanket and two sheets and placed him in a "suicide cell." (*Id.* at 4.) Staff informed Plaintiff that he likely could provide a urine sample while in the SHU holding cell. (*Id.* at 3.) According to Plaintiff, however, Officer Holbus refused to allow Plaintiff to provide a urine sample while in the SHU. (*Id.* at 4.) Plaintiff alleges that the cell had not been swept, there was a draft from a cell window, and the mattress was on the ground. (*Id.*)

---

[3]   Sweet potatoes are high in potassium. *See* http://www.webmd.com/food-recipes/5-winter-superfoods-sweet-potatoes-nutrient-profile ("Sweet potatoes . . . are packed with calcium, potassium, and vitamins A and C.") (last accessed Feb. 3, 2017).

5

Unidentified staff refused Plaintiff's requests to make telephone calls or access the inmate e-mail system. (*Id.*) Plaintiff alleges that he was not released from the SHU until six days later on March 23, 2016. (*Id.* at 5.) At that time, Plaintiff discovered that he was missing personal property. (*Id.*) Plaintiff seeks compensation for his lost property and asks to be transferred back to North Carolina. (*Id.* at 5–6.)

The Bureau of Prison's disciplinary process, set forth in 28 C.F.R. § 541.3, provides four categories of prohibited acts based on the severity of the conduct: (1) greatest; (2) high; (3) moderate; and (4) low. (Stolarzyk Decl. ¶ 3; Ex. A at 9–10.) "Refusing to provide a urine sample," Code 110, is in the "greatest" category. 28 C.F.R. § 541.3. "Refusing to obey an order of any staff member," Code 307, is in the "moderate" category. (*Id.*) If a prisoner commits a prohibited act, a staff member will prepare an incident report explaining the factual support for the alleged violation of the disciplinary codes and forward the incident report for investigation. (*Id.* ¶ 3; Ex. A at 17.) The investigating officer will provide the inmate with a copy of the incident report, ordinarily within twenty-four hours of the incident report. (*Id.*) Upon completion of the investigation, the investigating officer will refer the incident report to the Unit Discipline Committee ("UDC") for an initial hearing. (*Id.* ¶ 4; Ex. A at 23.) The UDC can (1) find the inmate committed the prohibited act and impose sanctions; (2) find the inmate did not commit the prohibited act; or (3) refer the incident report to the DHO for further hearing. (*Id.*) If the incident report is referred to the DHO, the DHO will hold a hearing and give the inmate an opportunity to make a statement and present witness and/or documentary evidence. (*Id.* ¶ 5; Ex. A at 29–30.) The DHO will make a determination as to whether

6

the inmate committed the prohibited act or refer the report back to the UDC for further investigation, review, and disposition. (*Id.* ¶ 5; Ex. A at 27.)

Defendant Culbertson delivered a copy of Incident Report 2828611 to Plaintiff on March 18, 2016, at 12:20 p.m. while Plaintiff was in the SHU. (*Id.* ¶ 11; Ex. D at 1.) At that time, Defendant Culbertson advised Plaintiff of his rights during the disciplinary process. (*Id.*; Ex. D at 2.) Plaintiff did not request witnesses or a staff representative at that time, and Officer Culbertson recommended referring the incident report to the UDC for a hearing. (*Id.*)

Because Plaintiff is civilly committed under § 4246, he was automatically referred by his Unit Team to Psychology for an evaluation of competency and responsibility. (*Id.* ¶ 12; Ex. E at 1.) The evaluating psychologist noted that Plaintiff had a history of being preoccupied with delusional beliefs about conspiracies to keep him incarcerated. (*Id.*) During the interview, Plaintiff provided documents that the psychologist characterized as "highly delusional." (*Id.*) The evaluation psychologist noted Plaintiff's claim that he could not produce a urine sample unless he was given potassium from sweet potatoes, which medical staff advised was inaccurate. (*Id.*) Ultimately, the evaluating psychologist concluded that due to these delusions, Plaintiff was not responsible for his refusal to provide a urine sample. (*Id.*)

On March 22, 2016, the UDC referred Incident Report 2828611 to the DHO with a recommendation that Plaintiff be found not responsible for his conduct based on the psychology evaluation. (*Id.* ¶ 13; Ex. D at 1.) No sanctions were recommended. (*Id.*) The

DHO concurred with this recommendation and did not impose any sanctions. (*Id.* ¶ 14; Ex. C at 1.)

## II.  DISCUSSION

Defendants argue that Plaintiff's claims against the Individual Defendants should be dismissed because they were pleaded as official capacity claims, not individual capacity claims. (Defs.' Mem. 12–16.) As a result, Defendants argue, the Court lacks subject-matter jurisdiction because official capacity claims against federal employees are construed as claims against the United States, which is immune from suit. (*Id.*) Defendants further argue that "FMC Minnesota" and "the Property R and D Operation" are not proper defendants. (*Id.* at 16–17.) Instead, the real party in interest is the United States, and sovereign immunity attaches. (*Id.*) Finally, even if sovereign immunity did not bar Plaintiff's claims, Defendants argue that the claims are without merit. (*Id.* at 17–33.)

### A.  Standard of Review

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the nonmoving party, shows no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Thomas v. Heartland Emp't Servs., LLC*, 797 F.3d 527, 529 (8th Cir. 2015). The movant bears the initial burden of informing the court of the basis for its motion and identifying "those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2011). If it does so, the nonmoving party may not rest on mere allegations or denials, but instead "must present affirmative evidence" of "specific facts showing that there is a

genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials . . . ."). Where the evidence "could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial" and summary judgment is warranted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted).

### B.     Sovereign Immunity

"Federal courts generally lack jurisdiction to hear claims against the United States because of sovereign immunity." *Barnes v. United States*, 448 F.3d 1065, 1066 (8th Cir. 2006). Claims that are brought against a federal official acting in his or her individual capacity, generally known as *Bivens* claims, are not barred by sovereign immunity. *Buford v. Runyon*, 160 F.3d 1199, 1203 n.6 (8th Cir. 1998) ("A *Bivens* claim is a cause of action brought directly under the United States Constitution against a federal official acting in his or her individual capacity for violations of constitutionally protected rights.") (citing *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971)). However, when claims are brought against a federal employee in his or her official capacity, the real party in interest is the United States, and sovereign immunity attaches. *Id.* at 1203.

If, as here, the complaint "is silent about the capacity in which [the plaintiff] is suing the defendant, [courts] interpret the complaint as including only official-capacity

claims." *Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 619 (8th Cir. 1995). Since Plaintiff's Complaint does not specify whether he is suing the Individual Defendants in their official capacities or their individual capacities, his claims must be construed as raising only official capacity claims. *See Andrus ex rel. Andrus v. Arkansas*, 197 F.3d 953, 955 (8th Cir. 1999) ("In actions against officers, specific pleading of individual capacity is required to put public officials on notice that they will be exposed to personal liability."). This Court also agrees with Defendants that the United States is the real party in interest with respect to any claims against "FMC Minnesota" and "the Property R and D Operation." *See FDIC v. Meyer*, 510 U.S. 471, 483–86 (1994) (rejecting a "*Bivens*-type cause of action directly against a federal agency").

Plaintiff's claims are therefore barred by sovereign immunity. Even so, this Court will address each claim that is arguably raised by Plaintiff's *pro se* complaint. *See Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015) ("When we say that a *pro se* complaint should be given liberal construction, we mean that if the essence of an allegation is discernible . . . then the district court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework."). They are without merit for the reasons that follow.

### C.    Due Process

Plaintiff appears to allege that his six-day SHU placement was a due process violation. The Supreme Court has held that prisoners have a liberty interest, protected by

the Due Process Clause,[4] in avoiding conditions of confinement that "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). A "demotion to segregation, even without cause, is not itself an atypical and significant hardship." *Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003) (emphasis added). Instead, Plaintiff "must show some difference between his new conditions in segregation and the conditions in the general population which amounts to an atypical and significant hardship." *Id.*

A segregation stay that is "particularly lengthy" might meet this standard, but six days in segregated housing falls well short of what the Eighth Circuit considers "atypical and significant." *Martin v. Hurley*, No. 1:13-CV-00048-SPM, 2015 WL 6750808, at *4 (E.D. Mo. Nov. 5, 2015). In *Martin*, for example, the prisoner-plaintiff spent 30 days in disciplinary segregation and 278 days in administrative segregation. 2015 WL 6750808, at *2. As the court explained in *Martin*, the "Eighth Circuit has held that confinement to disciplinary and/or administrative segregation, for time periods similar to (and even exceeding) the 308-day period at issue here, do not constitute an atypical and significant hardship that triggers due process protections." *Id.* at *4 (discussing *Hemphill v. Delo*, 124 F.3d 208 (8th Cir. 1997) (unpublished) and *Orr v. Larkins*, 610 F.3d 1032 (8th Cir. 2010)).

---

[4] The "Fifth Amendment, not the Fourteenth Amendment, . . . supplies the guarantee of due process to federal inmates." *Cherer v. Krawczyk*, Case No. 15-cv-00771-NJR, 2016 WL 270009, at *3 n.1 (S.D. Ill. Jan. 22, 2016) (citing *King v. Fed. Bureau of Prisons*, 415 F.3d 634, 636 (7th Cir. 2005)).

In addition to its duration, courts also consider the conditions of segregated confinement to determine whether it constitutes a hardship that is atypical and significant. *See Wilkinson v. Austin*, 545 U.S. 209, 223–24 (2005). Plaintiff alleges that he was forced to sleep on a mattress on the floor, that the cell was dirty and drafty, and that he was denied telephone and email privileges. These conditions, combined with the length of time he was subjected to them, do not implicate a liberty interest protected by due process. *Martin*, 2015 WL 6750808, at *4 (conditions such as the inability to leave cell for up to three days at a time and limited access to telephone, showering, laundry, and library materials do not "create an atypical and significant hardship in relation to the ordinary incidents of prison life"); *see also Kennedy v. Blankenship*, 100 F.3d 640, 642–43 n.2 (8th Cir. 1996) (30 days of punitive isolation with restrictions on mail, telephone, visitation, commissary, and personal possession privileges did not create a liberty interest); *Roberts v. Daviess Cnty. Det. Ctr.*, No. 4:16-CV-P63-JHM, 2016 WL 5844126, at *2 (W.D. Ky. Oct. 4, 2016) (finding placement in "isolation for six days with no mat, no blanket, and 'no hygiene'—which the Court construes as no access to a shower" did not create a liberty interest).

Plaintiff offers nothing beyond the sparse allegations in his complaint to describe the length and conditions of his confinement during his stay in SHU. Those allegations, standing alone, fail to create a genuine issue of material fact as to whether Plaintiff's detention was an "atypical and significant hardship." *Sandin*, 515 U.S. at 484. Therefore, Defendants are entitled to summary judgment on Plaintiff's due process claim.

Plaintiff also appears to bring a procedural due process claim. Before an inmate can be deprived of a protected liberty or property interest, the inmate must receive (1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action. *See Espinoza v. Peterson*, 283 F.3d 949, 952 (8th Cir. 2002) (citing *Superintendent v. Hill*, 472 U.S. 445, 454 (1985)). This claim fails because Plaintiff's SHU confinement does not implicate a constitutionally-protected liberty interest. *King v. Dingle*, 702 F. Supp. 2d 1049, 1075 (D. Minn. 2010) (citing *Ragan v. Lynch*, 113 F.3d 875, 876 (8th Cir. 1997)); *Wilkinson*, 545 U.S. at 221 ("We need reach the question of what process is due only if the inmates establish a constitutionally protected liberty interest.").[5]

### D. Conditions of Confinement in SHU

Plaintiff's Complaint can also be construed as alleging that the conditions during his alleged SHU stay—mattress on a dirty floor, cold draft, blanket and two sheets—were cruel and unusual. This is a due process claim, not an Eighth Amendment claim, because Plaintiff is civilly committed. *See Revels v. Vincenz*, 382 F.3d 870, 874 (8th Cir. 2004) ("[B]ecause an involuntarily committed psychiatric patient is confined for treatment rather than incarcerated for the purpose of punishment following conviction, the Eighth

---

[5] Defendants provided due process in connection with the disciplinary proceedings that resulted from Plaintiff's failure to provide a urine sample. Plaintiff, however, was not disciplined as a result of that process.

Amendment does not apply."). Even so, the legal standard is the same. *See Roblero-Barrios v. Ludeman*, Civil No. 07-4101 MJD/FLN, 2008 WL 4838726, at *7 (D. Minn. Nov. 5, 2008) ("[T]he deliberate indifference standard of the Eighth Amendment remains applicable to civilly committed patients challenging the conditions of confinement under [due process].") (citing *Senty-Haugen v. Goodno*, 462 F.3d 876, 889 (8th Cir. 2006)); *Beaulieu v. Ludeman*, 690 F.3d 1017, 1045 (8th Cir. 2012) ("[C]ivilly-committed persons, like pretrial detainees, are entitled to at least as great protection as that afforded convicted prisoners under the Eighth Amendment.").

In order to establish a constitutional violation in this context, Plaintiff must show (1) that the conditions of his confinement "posed a substantial risk of serious harm (objective component)," and (2) that Defendants "actually knew of but disregarded, or were deliberately indifferent to, [his] health or safety (subjective component)." *Beaulieu*, 690 F.3d at 1045. First, Plaintiff's stay in the allegedly "dirty" cell lasted only six days. "Conditions, such as a filthy cell, may be 'tolerable for a few days and intolerably cruel for weeks or months.'" *Whitnack v. Douglas Cnty.*, 16 F.3d 954, 958 (8th Cir. 1994) (quoting *Hutto v. Finney*, 437 U.S. 678, 687 (1978)). Plaintiff was not "deprived of an identifiable human need immediately upon being subjected to" an allegedly "inhumane condition." *Id.* Second, Plaintiff never complained to Defendants about his cell, the condition of which was not so egregious that the risk of harm was obvious. *See Simmons v. Cook*, 154 F.3d 805, 808 (8th Cir. 1998) ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.") (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). Therefore, Plaintiff cannot establish that

the conditions of his confinement rose to a constitutional violation during his six-day SHU confinement.

### E. Deprivation of Personal Property

Liberally construed, Plaintiff's Complaint does not allege that any of the Defendants were involved with his loss of property. Instead, Plaintiff alleges that an unidentified "Package-ing Unit Officer" stole or threw away his property. (Compl. 5.) Thus, there is no issue of fact as to whether any of the Individual Defendants were personally involved with this alleged due process violation. *See Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009) ("Defendants [in a *Bivens*] action are liable for their personal acts only."). Moreover, Plaintiff did not file an administrative claim for the loss of this property. (Doc. No. 12, Declaration of Jake Bush, ¶¶ 5–6, Ex. A, B.) This claim is therefore also deficient as a matter of law. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("[A]n unauthorized intentional deprivation of property . . . does not constitute a violation of the procedural requirements of [due process] if a meaningful postdeprivation remedy for the loss is available.").

### F. Random Urinalysis - Fourth Amendment

Finally, Plaintiff challenges the ability of Defendants to subject him to a random urine sample requirement because he is not a "Recognizable Drug-Abuser." (Compl. 5.) Involuntarily committed civil detainees have a Fourth Amendment right to be free from unreasonable searches and seizures similar to that of pretrial detainees. *Evenstad v. Herberg*, 994 F. Supp. 2d 995, 1002 (D. Minn. 2014) (citing *Serna v. Goodno*, 567 F.3d 944, 948 (8th Cir. 2009)). A pretrial detainee retains "some Fourth Amendment rights

upon commitment to a corrections facility," but his reasonable expectation of privacy is "necessarily" of a "diminished scope" given the realities of institutional commitment. *Bell v. Wolfish*, 441 U.S. 520, 557–58 (1979). Since "the Eighth Circuit has applied the same constitutional standard for pretrial detainees to civilly committed individuals, . . . *Wolfish* sets the appropriate standard" for Plaintiff's claim. *Evenstad*, 994 F. Supp. 2d at 1002. Relying on *Wolfish*, the Eighth Circuit has also held that random urine testing for prisoners does not violate the Fourth Amendment. *Spence v. Farrier*, 807 F.2d 753, 755 (8th Cir. 1986) ("A reasonableness analysis involves '[b]alancing the significant and legitimate security interests of the institution against the privacy interests of the inmates.'") (quoting *Wolfish*, 441 U.S. at 560). For the same reasons, Plaintiff's random urine test did not violate the Fourth Amendment. *See id.* ("The unauthorized use of narcotics is a problem that plagues virtually every penal and detention center in the country. Because of the prison's security needs, the prisoner's expectation of privacy in his or her body is diminished. The prisoners' limited expectation of privacy does not forbid random urine collection and analysis.")

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendants' Motion for Summary Judgment (Doc. No. 8) be **GRANTED**; and

2. This action be **DISMISSED WITH PREJUDICE**.

Date: March 10, 2017.

*s/ Becky R. Thorson*
BECKY R. THORSON
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).